# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **KEVIN ESPINOSA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 12-1348 (ESH)** |
| | ) | |
| **MICHAEL ASTRUE,** | ) | |
| **Commissioner,** | ) | |
| **Social Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Kevin Espinosa brings this action under the Social Security Act, 42 U.S.C.

§ 405(g), seeking a reversal of the Social Security Administration's ("SSA") denial of his claims

for disability benefits and supplemental security income benefits.  In the alternative, plaintiff

seeks a remand to the SSA for a new administrative hearing.  Currently before the Court are the

parties' cross-motions for judgment.  For the reasons stated below, the Court will grant plaintiff's

motion for reversal of judgment and deny defendant's motion for affirmance.

## BACKGROUND

Plaintiff Kevin Espinosa, a 31-year-old man, resides in Washington, D.C.

(Administrative Record, Oct. 26, 2012 [ECF No. 6] ("AR") at 28.)  He has completed two years

of community college and has prior work experience as an account agent and front office

manager at a hotel, an account manager at a performing rights organization, a class teacher at a

daycare center, a program coordinator at a youth center, and a counselor at a teen center.  (*Id.* at

29, 139, 145.)  In July 2009, plaintiff filed an application for social security disability benefits.

(*Id.* at 107-20.)  He alleged that since June 2, 2009, he has been disabled due to obsessive-

compulsive disorder ("OCD") and depression.  (*Id.*)  The SSA denied plaintiff benefits initially

in October 2009, and again upon reconsideration in March 2010.  (*Id.* at 53-59, 62-68.)  In July

2011, plaintiff appeared with his attorney at an administrative hearing.  (*Id.* at 25-41, 75-92.)

After the hearing, the administrative law judge ("ALJ"), Eugene Bond, denied plaintiff's claims

because he found plaintiff not disabled within the meaning of the Social Security Act.  (*Id.* at 12-

20.)  In June 2012, the Appeals Council denied plaintiff's request for review.  (*Id.* at 1-6.)

## I.     THE EVIDENCE AT THE ADMINISTRATIVE HEARING

The evidence in the administrative record included plaintiff's self-assessment reports,

medical records from his treating physician and several other doctors, and the hearing testimony.

### A.     Plaintiff's Reports

Plaintiff's disability and functional capabilities were set forth in reports that he filed with

his application for benefits.  (*Id.* at 107-88.)  In three disability reports filed in July 2009,

December 2009, and May 2010, plaintiff reported that he suffered from depression, OCD,

anxiety, sleep disturbances, panic attacks, social isolation, and an eating disorder.  (*Id.* at 134-44,

161-71, 180-88.)  He reported that these conditions limited his ability to work.  (*Id.* at 138.)  For

example, he would disregard job duties, wait until he thought he would be fired, and then leave

his job.  (*Id.*)  Plaintiff explained that he did not plan to return to work because he could not

focus and his condition had become worse.  (*Id.*)

In two function reports filed in September 2009 and January 2010, plaintiff reported that

he spent most of the day taking care of his infant son, including playing with him and reading to

him.  (*Id.* at 153.)  Plaintiff stated that during a "good week," he made dinner daily, and he

performed chores and shopped for food and baby materials on a weekly basis.  (*Id.* at 153-60,

172-79.)  Plaintiff also stated that he often missed appointments and procrastinated performing hygienic routines such as shaving and showering.  (*Id.* at 172.)

**B.     Medical Records**

**i.     Plaintiff's Treating Physician**

Plaintiff's medical records cover a three-year span, and they include records from several doctors.  Plaintiff first saw his treating physician, psychologist Dr. Don Miller, in 2009.  (*Id.* at 239-44.)  In September of 2009, Dr. Miller provided a report stating that his diagnostic impressions of plaintiff included recurrent and severe major depressive disorder, OCD, and attention deficit/hyperactive disorder, and, therefore, plaintiff is "totally disabled and is unable to work at the present time and in all probability . . . for an additional twelve months."  (*Id.* at 241.) Dr. Miller recommended that plaintiff be "referred for further evaluation, academic or vocational training," continue psychotherapy, and enroll in leisurely activities in line with his interests and abilities.  (*Id.*)

In January 2010, Dr. Miller provided another report, in which he stated that plaintiff continued to be unable to work.  (*Id.* at 289-91.)  In a November 2010 report, Dr. Miller again stated that his diagnostic impressions of plaintiff included recurrent and severe major depressive disorder and OCD.  (*Id.* at 297.)  Dr. Miller also noted post-traumatic stress disorder in partial remission and polysubstance dependence in full remission.  (*Id.*)  He recommended continued therapy, routine psychiatric and general medical examinations, attendance at twice weekly narcotics anonymous meetings, and if that level of intervention did not work, "day treatment and/or partial hospitalization."  (*Id.* at 298.)  Dr. Miller also explained that "quite surprisingly. . . [plaintiff] appears to be adjusting well in, entirely committed to, and performing above expectations in the role and related responsibilities of a single parent father."  (*Id.*)

On July 1, 2011, Dr. Miller provided another report, indicating that he found plaintiff had marked[1] limitations in several areas of functioning.  (*Id.* at 301-03.)  For example, Dr. Miller noted, among other things, that plaintiff had trouble carrying out detailed instructions, maintaining attention and concentration for extended periods of time, sustaining an ordinary routine, working in coordination or in proximity with others, making simple work-related decisions, and behaving in a socially appropriate way.  (*Id.*)  Dr. Miller wrote that plaintiff has been fully and completely disabled for the past several years and will likely suffer from "this level of disability for some time to come."  (*Id.* at 304.)  Dr. Miller amended this report on July 22, 2011, adding that plaintiff's condition would cause him to attend work for only 50 percent of the time and fail to be punctual 100 percent of the time.  (*Id.* at 316.)

### ii.      Other Medical Records

The record also contains reports from several other, non-treating physicians.  For example, in September 2009, Dr. Aroon Suansilppongse, a consulting psychiatrist, noted plaintiff's mood disorder, a history of OCD, and moderate limitations in several areas.[2]  (*Id.* at 246-63.)  Dr. Samuel Scott, Jr., a Senior Clinical Associate for Washington Occupational Health Associates, Inc., and consultative physician for the government, also provided a report in October 2009.  (*Id.* at 264-67.)  Dr. Scott stated that plaintiff "has depression and OCD with symptoms that are not fully controlled on his current therapeutic regimen."  (*Id.* at 265.)  Dr. Scott opined that these symptoms limited plaintiff's ability to work at that time.  (*Id.*)  He

---

[1] According to SSA regulations, a "marked" limitation means more than moderate but less than extreme.  20 C.F.R. § 416.926a(e).

[2] For example, Dr. Suansilppongse noted moderate limitations in plaintiff's ability to maintain concentration for extended periods, perform activities according to a schedule, maintain regular and punctual attendance, complete a work week without interruption from his psychological symptoms, respond to change, and set realistic goals.  (*Id.* at 246-63.)  Dr. Suansilppongse also noted plaintiff's moderate limitations in several areas relating to social interaction.  (*Id.*)

recommended that plaintiff continue therapy and seek out supportive services to help him pursue his education and employment.  (*Id.*)

In January 2010, Dr. Jean D'Souza of Washington Hospital Center wrote a treatment note indicating that plaintiff was stable, he displayed fair insight and judgment, his anxiety was better, and although he continued to have nightmares and flashbacks, these experiences didn't "bother him anymore."  (*Id.* at 282.)

In March 2010, Dr. P. Polizos, a consulting psychiatrist, reviewed medical reports from Dr. Miller and Dr. Souza.  (*Id.* at 292.)  He noted that plaintiff had a good memory and an ability to sustain concentration despite suffering from anxiety and "obsessions about neatness."  (*Id.*)

In August 2010, plaintiff returned to Dr. Souza for a second visit.  (*Id.* at 326.)  The doctor noted that plaintiff still suffered from previously reported symptoms and recommended that plaintiff continue current medication and schedule a follow up appointment.  (*Id.*)  When Dr. Souza saw plaintiff again in November 2010, plaintiff reported that his symptoms were "much better while on medication," his sleep had improved, and his panic attacks occurred once a week. (*Id.* at 299.)  Dr. Souza determined that plaintiff had good insight and judgment, but he recommended continued medication and therapy.  (*Id.*)  The next month, in December 2010, when plaintiff returned to Dr. Souza, plaintiff reported increased anxiety about the upcoming court procedure relating to custody of his son, increased paranoia, and social anxiety.  (*Id.* at 325.)  Dr. Souza increased plaintiff's medication and recommended a follow up appointment. (*Id.*)

When plaintiff returned to Washington Hospital Center next, in January 2011, he saw Dr. Philip A. Seibel instead of Dr. Souza.  (*Id.* at 323.)  Dr. Seibel noted plaintiff's good insight and judgment, normal memory and thought content, and anxious mood.  (*Id.*)  Plaintiff reported

increased anxiety attacks, occurring once or twice daily.  (*Id.*)  Dr. Seibel recommended

continued medication and therapy.  (*Id.*)  In February 2011, Dr. Seibel saw plaintiff again on two

occasions.  During the first meeting, he noted plaintiff's impaired insight, anxious and depressed

mood, and a labile affect.  (*Id.* at 322.)  During the second meeting a few weeks later, he

continued to note plaintiff's anxious mood.  (*Id.* at 320.)  Dr. Seibel recommended increased

medication and a follow up with Dr. Miller.  (*Id.*)

      In May 2011, plaintiff returned to Washington Hospital Center and saw Dr. Makesha

Joyner, who found that plaintiff had only fair insight and judgment and recommended continued

medication.  (*Id.* at 319.)

      **C.**       **The Hearing Testimony**

      Plaintiff and a vocational expert testified at the hearing.  Plaintiff testified that at his last

job, he would show up four hours late because he had trouble getting out of bed unless it was

within a certain, randomly chosen increment of time.  (*Id.* at 30.)  He explained that he has not

looked for any work since his last job because "[his] doctor told him he shouldn't be working."

(*Id.*)  When discussing his daily activities, plaintiff testified that he and his son frequently spend

time at his mother's house.  (*Id.*)  Plaintiff also testified that he routinely attends therapy and

narcotics anonymous meetings.  (*Id.* at 32.)

      In addition to plaintiff, a vocational expert testified.  (*Id.* at 36.)  The ALJ asked the

vocational expert to identify the jobs, if any, that exist for a hypothetical person who has the

same age, education, and work experience as the plaintiff and has the capacity to do either

sedentary or light, unskilled work with limited public contact.  (*Id.* at 37-38.)  The vocational

expert identified several jobs that fit both the sedentary and light work characteristics, and that

have at least over 400 positions locally and at least over 40,000 nationally.  (*Id.*)  When asked if

there would still be jobs available for a person who performs at "less than eighty percent required by the employer," the vocational expert stated that "typically employers will not tolerate more than a twelve to fifteen percent decrease in productivity" and "anything beyond that would limit the individual's ability to maintain work."  (*Id.* at 39.)

## ANALYSIS

### I.    STANDARD OF REVIEW

A district court is limited in its review of the SSA's findings to a determination whether those findings are based on substantial evidence.  42 U.S.C. § 405(g); *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004); *Poulin v. Bowen*, 817 F.2d 865, 870 (D.C. Cir. 1987). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "The test 'requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence.'"  *Butler*, 353 F.3d at 999 (quoting *Fla. Mun. Power Agency v. Federal Energy Regulatory Comm'n*, 315 F.3d 362, 365-66 (D.C. Cir. 2003)); *see Turner v. Astrue*, 710 F. Supp. 2d 95, 104-05 (D.D.C. 2010).

In order to qualify for disability benefits, an individual must prove that he has a disability that renders him unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" for a period of "not less than 12 months." 42 U.S.C. § 423(a)(1), (d)(1)(A).  The claimant must support his claim of impairment with "[o]bjective medical evidence" that is "established by medically acceptable clinical or laboratory diagnostic techniques."  *Id.* § 423(d)(5)(A).  In addition, the impairment must be severe enough to prevent the claimant from doing his previous work and work consummate with his age, education, and work experience that exists in the national economy.  *Id.* § 423(d)(2)(A).

The SSA uses a five-step evaluation process to determine whether a claimant is disabled so as to qualify for benefits.  A clear determination of disability or non-disability at any step is definitive, and the process ends at that step.  *Id.* § 404.1520(a)(4).  In the first step, a claimant is disqualified if he is currently engaged in "substantive gainful activity."  *Id.* § 404.1520(a)(4)(i).  In the second step, a claimant is disqualified if he does not have a "severe medically determinable physical or mental impairment" that is proven "by medically acceptable clinical and laboratory diagnostic techniques."  *Id.* § 404.1520(a)(4)(ii).  In the third step, a claimant qualifies for benefits if his impairment(s) meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.* § 404.1520(a)(4)(iii).  Between the third and fourth step, the SSA uses the entire record to make a determination of the claimant's residual functional capacity ("RFC"), which is "the most [the claimant] can still do despite [the] limitations" caused by the impairment.  *Id.* §§ 401.1520(a)(4), 404.1545(a)(1).  In the fourth step, a claimant is disqualified if his RFC shows that he is still able to do his past relevant work.  *Id.* §§ 404.1520(a)(4)(v), 404.1545(a)(5)(ii).  In the fifth step, a claimant is disqualified if his RFC shows that he is capable of adapting to "other work that exists in the national economy."  *Id.* §§ 404.1520(a)(4)(v), 404.1545(a)(5)(ii).  If the claim survives these steps, the claimant is then determined to be disabled and qualifies for benefits.  *Id.* § 404.1520(a)(4)(v).

In this case, the ALJ found that plaintiff's claim failed at step three, or, in the alternative, he failed at step five.  (AR at 14.)  At step one, the ALJ found that plaintiff was not engaged in substantial gainful activity during the time he qualified for benefits, thus moving to step two. (*Id.*)  At step two, the ALJ found that plaintiff does have "severe" medically determinable impairments: depression and illegal drugs.  (*Id.*)  At step three, the ALJ found that plaintiff does not have an impairment or combination of impairments that meets or medically equals the

severity of listings 12.04 (affective disorders), 12.06 (anxiety related disorders), or 12.09

(substance addition disorders).  (*Id.*)  At step four, the ALJ found that plaintiff would be unable

to perform any past relevant work because his past experience required constant contact with the

public.  (*Id.* at 18.)  However, at step five, the ALJ found that plaintiff has the RFC to perform

"sedentary unskilled work . . . except [he] should have limited public contact."  (*Id.* at 15.)  The

ALJ noted that the vocational expert testified that jobs do exist in both the local and national

economy for an individual with plaintiff's age, education, work experience, and RFC.  (*Id.* at 18-

19.)  Thus, the ALJ concluded that plaintiff is capable of making a successful adjustment to other

work that exists in significant numbers in the national economy.  (*Id.*)

## II.     REVIEW OF ALJ'S OPINION

Plaintiff raises three challenges to the ALJ's decision.  (Plaintiff's Motion for Judgment

of Reversal, Jan. 4, 2013 [ECF No. 9] ("Pl. Mot.") at 5.)  First, plaintiff argues that the ALJ

weighed the medical evidence from Dr. Miller, plaintiff's treating physician, in a manner

contrary to law.  (*Id.*)  Second, plaintiff contends that ALJ failed to properly consider the

testimony of the vocational expert.  (*Id.*)  Third, plaintiff claims that the ALJ made several other

findings not supported by substantial evidence.  (*Id.*)

### A.     Weight of Treating Physician's Opinion

Pursuant to this Circuit's "treating physician rule," "a treating physician's report is

binding on the fact-finder unless contradicted by substantial evidence."  *Butler*, 353 F.3d at 1003

(internal quotation marks and citations omitted); *see* 20 C.F.R. § 404.1527(c)(2) (stating that

when "a treating [physician]'s opinion . . . is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in

[plaintiff's] case record, [SSA] will give it controlling weight"); *Smith v. Astrue*, 534 F. Supp. 2d

121, 131 (D.C. Cir. 2008); *Poulin*, 817 F.2d at 873.  Generally, SSA will also give more weight

to a physician if the physician has had a longer treatment relationship with the plaintiff, a higher

frequency of examination of the plaintiff, or a specialty in a relevant medical area.  *See* 20 C.F.R.

§ 404.1527(c).  If an ALJ rejects a treating physician's opinion, "the ALJ bears the burden of

explaining why he has rejected the treating physician's opinion and how the doctor's assessment

is contradicted by substantial evidence."  *Turner*, 710 F. Supp. 2d at 106 (internal quotation

marks and citations omitted); *see Butler*, 353 F.3d at 1003 ("We . . . require an ALJ who rejects

the opinion of a treating physician [to] explain his reasons for doing so." (internal quotation

marks omitted)).

Plaintiff argues that Dr. Miller's opinion on plaintiff's condition is "consistent with other

substantial evidence in the record," and therefore, the ALJ should not have discounted Dr.

Miller's opinion when determining plaintiff's entitlement to disability benefits.  (Plaintiff's

Response in Opposition to Motion for Judgment of Reversal, Mar. 14, 2013 [EFC No. 12] ("Pl.

Opp'n") at 2.)  In response, the government argues that the ALJ correctly discounted Dr. Miller's

opinion because Dr. Miller's opinion is "inconsistent with the other evidence in the record."

(Government's Motion for Judgment of Affirmance, Mar. 4, 2013 [ECF No. 10] ("Gov't Mot.")

at 11.)

Having reviewed the record, the Court finds that the ALJ committed an error by rejecting

the opinion of the treating physician.  The ALJ concluded that Dr. Miller's "opinion is without

substantial support from the other evidence in the record, which obviously renders it less

persuasive."  (AR at 18.)  To elaborate on this point, the ALJ stated, "the record contains an

opinion from a non-treating doctor, which supports the RFC reached in this decision."  (*Id.*)  He

did not, however, explain why the opinion from "a non-treating doctor" (presumably Dr. Souza),

discredits Dr. Miller's opinion.  *See Jones*, 647 F.3d at 355 (reversing the SSA's denial of an

application for disability benefits because the ALJ's "bare statement, sans any explanation,

violates the treating physician rule"); *Simms v. Sullivan*, 877 F.2d 1047, 1052 (D.C. Cir. 1989)

(reversing the SSA's denial of an application for disability benefits because the ALJ "offered no

reason for crediting the consulting physicians over" the treating physician).  In its brief, the

government attempts to explain the ALJ's reasoning, but in reviewing a social security disability

administrative decision, the Court may only consider the grounds proffered by the agency in its

decision for *post hoc* rationalizations do not suffice.  *See Clark v. Astrue*, 826 F. Supp. 2d 13

(D.D.C. 2011).  This finding alone would justify a remand for the ALJ to more fully explain his

findings.

  However, in addition to failing to adequately explain his reasoning, the ALJ also

incorrectly determined that Dr. Miller's opinion was not supported by other substantial evidence

in the record, thereby rendering it "less persuasive."  (AR at 18.)  The Court disagrees and

concludes that Dr. Miller's opinion was supported by substantial evidence for three reasons.

First, Dr. Miller's opinion is consistent with opinions of other doctors who saw plaintiff.  (*See id.*

at 195-329.)  For example, both Dr. Miller and Dr. Souza (the only other doctor's opinion

relating to plaintiff's mental health that the ALJ mentions) described plaintiff as suffering from

depression (*id.* at 282, 297), anxiety (*id.* at 290, 300, 325), sleep disturbances (*id.* at 282, 290),

panic attacks (*id.* at 290, 299), changes in appetite (*id.* at 299, 303), and suicidal thoughts (*id.* at

299, 303).  Even Dr. Scott, a consultative examiner for the government who only saw plaintiff

once, noted that plaintiff has depression, OCD, sleep disturbances, and panic attacks that "impair

his ability to work at this time."  (*Id.* at 264.)  Also, in the year during which Dr. Miller and Dr.

Souza both treated plaintiff, they both noted periods of improving and worsening conditions.

(*Id.* at 297-98, 325.)  Changes in the severity of plaintiff's condition over time are hardly

unusual, since, as plaintiff points out, people with mental illnesses have periods where their

condition is better and periods when their condition is worse.  (Pl. Opp'n at 2.)  Indeed, most of

the doctors who saw plaintiff, including Drs. Souza, Scott, Seibel, and Joyner, recommended that

plaintiff continue medication and routine therapy, suggesting that they viewed the severity of his

condition similarly to Dr. Miller.[3]  (AR at 265, 319, 322, 326.)  There are slight differences

among the doctors.  For example, Dr. Miller and Dr. Souza described plaintiff's insight and

judgment as being lower than indicated by other doctors, including Dr. Seibel.  (*Id.* at 297-98,

325-26.)  However, as plaintiff explains, "no two doctors will have precisely the same

interpretation of a patient's functioning," especially when the patient has a mental illness, and the

differences in the opinions are not significant.  (Pl. Opp'n at 2.)  Thus, contrary to the ALJ's

decision, there was substantial support for Dr. Miller's opinion.

Second, Dr. Miller is a specialist in psychology and saw plaintiff most frequently and for

the longest period of time.  As a result, his opinion should be given more weight than non-

specialists who saw plaintiff less frequently and for a far shorter length of time.  *See* 20 C.F.R.

§ 404.1527(c).  As plaintiff points out, a treating physician brings a unique perspective to the

medical evidence, especially when a plaintiff "alleges mental illness, since a doctor's diagnosis

and evaluation of these disorders depends not on more objective criteria, . . . but on what the

patient discloses and what the physician observes."  (Pl. Mot. at 7.)  Dr. Miller saw plaintiff from

two to five times weekly over the course of several years and was still treating him at the time of

the hearing.  (AR at 316.)  By contrast, Dr. Souza saw plaintiff four times during one year.  (*Id.*

at 299, 318-29.)  Other doctors, such as Dr. Suansilppongse and Dr. Scott, only saw plaintiff

---

[3] In a November 2010 report, Dr. Miller recommended that plaintiff may be a candidate for "day
treatment and/or partial hospitalization" *if* other recommended treatment did not work.  (AR at
297.)

once. (*Id.* at 246-65.) Also, Dr. Scott is not a psychologist. (*Id.* at 264-65.) Thus, Dr. Miller's opinion was entitled to be given "controlling weight." *See* 20 C.F.R. § 404.1527(c)(2).

Third, contrary to the ALJ's suggestion, plaintiff's statements regarding his daily activities, including his raising of his young son, do not undermine Dr. Miller's opinion. The government argues that plaintiff's "consistent ability to care for his young son . . . shows an ability to tolerate regular physical and mental demands and undermines any contention that [plaintiff] cannot perform any work." (Gov't Mot. at 14.) However, there is no evidence in the record about the quality of care that plaintiff has provided for his son. Also, as plaintiff states, "monitoring a child who is dropped off at [plaintiff]'s house . . . with frequent assistance from relatives and friends, is quite different from leaving the house each day, arriving to work on time, [and] independently performing a job . . . ." (Pl. Opp'n at 6.) Thus, plaintiff's statements regarding his daily activities do not contradict Dr. Miller's opinion about the severity of his condition.

As a result, if the ALJ had properly considered Dr. Miller's opinion, he would have concluded there was substantial evidence to show that plaintiff had met listings 12.04 (affective disorders) and 12.06 (anxiety related disorders), and he would have found plaintiff disabled at step three. *See* 20 C.F.R. § 404, Appendix 1 to Subpart P. Affective disorders (12.04) are characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. *See id.* The required level of severity for these disorders is met when the requirements in both paragraphs A and B are satisfied. *See id.* Dr. Miller's opinion indicates that plaintiff meets paragraph A because he has medically documented persistence, either continuous or intermittent, of depressive syndrome, which is characterized by appetite disturbance with change in weight, sleep disturbance, difficulty concentrating or thinking, and

thoughts of suicide.  (*See* AR at 300-01.)  Plaintiff also meets paragraph B requirements because

Dr. Miller found that he has marked restriction of activities of daily living, marked difficulties in

maintaining social functioning, and marked difficulties in maintaining concentration, persistence,

or pace.  (*See id.*; *see also id.* at 240, 303, 325, 327.)  20 C.F.R. § 404, Appendix 1 to Subpart P.

In anxiety-related disorders (12.06), anxiety is either the predominant disturbance or it is

experienced if the individual attempts to master symptoms.  *See* 20 C.F.R. § 404, Appendix 1 to

Subpart P.  The required level of severity for these disorders is met when the requirements in

both paragraphs A and B are satisfied.  *See id.*  Dr. Miller's opinion indicates that plaintiff meets

paragraph A because he has recurrent severe panic attacks manifested by a sudden unpredictable

onset of intense apprehension, fear, terror and sense of impending doom occurring on the

average of at least once a week, or recurrent obsessions or compulsions which are a source of

marked distress.  (AR at 300-01.)  *See* 20 C.F.R. § 404, Appendix 1 to Subpart P.  Plaintiff meets

paragraph B requirements because Dr. Miller opined he has marked restriction of activities of

daily living, marked difficulties in maintaining social functioning, and marked difficulties in

maintaining concentration, persistence, or pace.  (AR at 300-01.)  *See* 20 C.F.R. § 404, Appendix

1 to Subpart P.

Therefore, the Court concludes that the ALJ weighed the medical evidence from Dr.

Miller in a manner contrary to law.

### B.      Vocational Expert's Testimony

Since the ALJ should have concluded his analysis at step three, it would not have been

necessary to have a vocational expert testify at step five to determine if plaintiff is capable of

making a successful adjustment to other work that exists in significant numbers in the national

economy.  Nonetheless, the ALJ went on to consider step five and concluded plaintiff was not

disabled.  The Court finds that this conclusion was error, since there is substantial evidence to find plaintiff disabled at step five.

At step five, the last step of the evaluation process, the burden shifts to the ALJ to demonstrate that, considering the plaintiff's RFC, age, education, and past work experience, he can find a job that exists in the economy.  *See Blackmon v. Astrue*, 719 F. Supp. 2d 80, 83 (D.D.C. 2010).  To meet this burden, Social Security regulations permit an ALJ to consider the testimony of a vocational expert.  *See* 20 C.F.R. §§ 404.1566(e), 416.966(e).  Hypothetical questions to a vocational expert "must present a faithful summary of the treating physician's diagnosis unless the ALJ provides good reason to disregard that physician's conclusions." *Lockard v. Apfel*, 175 F. Supp. 2d 28, 32 (D.D.C. 2001).

Dr. Miller opined that plaintiff's condition would cause him to miss work 50 percent of the time and be late 100 percent of the time.  (AR at 316.)  The vocational expert then testified, in response to a hypothetical question, that an employer would not tolerate more than a 12 to 15 percent decrease in productivity.  (*Id.* at 15, 316.)  The ALJ disregarded this testimony.  The government argues that since Dr. Miller's opinion is inconsistent with the record, the ALJ had no duty to adopt the vocational expert testimony regarding plaintiff's limitations which are based on Dr. Miller's opinion.  (Gov't Mot. at 16.)  Plaintiff, however, insists that because Dr. Miller's opinion should have been given controlling weight, the ALJ should have concluded that plaintiff could not work.  (Pl. Mot. at 5.)

As the Court has already noted, the ALJ did not provide a reasoned decision for disregarding Dr. Miller's opinion.  If Dr. Miller's opinion is given appropriate weight, there is substantial evidence that the plaintiff would not show up to work 50 percent of the time and would be late 100 percent of the time, and would therefore be operating at a productivity level

below the 12 to 15 percent required by employers.  (AR at 15, 316.)  Dr. Miller based his opinion

on plaintiff's difficulty over the past several years in attending twice weekly therapy

appointments and in arriving to these appointments on time.  (*Id.* at 316.)  Also, plaintiff himself

testified that he had been fired from a job because he could not be punctual.  (*Id.* at 30, 316.)

Accordingly, considering the plaintiff's RFC, age, education, and past work experience, plaintiff

would not be able to find a job that exists in the economy.  *See* 20 C.F.R. §§ 404.1566(e),

416.966(e).  Therefore, there is not substantial evidence in the record to support the ALJ's

determination that plaintiff is not disabled.[4]

### C.      Remand Solely for the Award of Benefits

Plaintiff argues that if the Court finds that the ALJ's decision was contrary to law and

unsupported by substantial evidence, the remand order should be for an award of benefits rather

than for further proceedings.  (Pl. Mot. at 12.)  A remand solely for the award of benefits

is appropriate "where the evidence on the record as a whole is clearly indicative of disability and

additional hearings would serve no purpose other than to delay the inevitable receipt of

benefits[.]"  *Hawkins v. Massanari*, No. 00-2102, 2002 WL 379898, at *4 (D.D.C. Mar. 8, 2002)

(citation omitted); *Lockard v. Apfel*, 175 F. Supp. 2d 28, 34 (D.D.C. 2001) (reversal is

appropriate where "the administrative record has been fully developed and new facts would not

be explored on remand[ ]"); *Martin v. Apfel*, 118 F. Supp. 2d 9, 18 (D.D.C. 2000) ("[W]here the

record in the case has been thoroughly developed, and a rehearing would merely function to

delay the award of benefits, reversal [instead of remand] is appropriate" (citation omitted));

*Ademakinwa v. Astrue*, 696 F. Supp. 2d 107, 111 (D.D.C. 2010).

---

[4]  Plaintiff also argues that the ALJ made several other findings not supported by substantial
evidence.  (Pl. Mot. at 5.)  Since the Court has concluded that there is substantial evidence to find
plaintiff disabled at either step three or at step five, the Court need not address plaintiff's other
arguments.

As discussed above, the Court has determined that if Dr. Miller's testimony had been properly considered at step three, plaintiff would have met SSA's definition of disability in listings 12.04 and 12.06.  In the alternative, at step five, plaintiff could not find a job that exists in the economy because an employer would not tolerate the low level of productivity that Dr. Miller assessed plaintiff of producing.  A remand for further proceedings would therefore impose an unnecessary delay on plaintiff's application.

## CONCLUSION

For the foregoing reasons, the Court will grant plaintiff's motion for reversal of judgment and deny defendant's motion for affirmance.  The Court remands the case for the award of benefits.  A separate Order accompanies this Memorandum Opinion.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

DATE: July 2, 2013